## PAINE LUMBER CO., Limited, v. UNITED STATES.

### (Circuit Court, E. D. Wisconsin. January 9, 1893.)

1. EMINENT DOMAIN—RIGHT TO RECOVER DAMAGES SUSTAINED BY GRANTOR.

A proceeding was begun against the United States to ascertain the damages caused to a sawmill, etc., by the flooding thereof through the raising of a dam for the purpose of improving the navigation of a river. The plaintiff corporation was organized in May, 1883, succeeding to a firm which had owned the premises from about 1855. Plaintiff offered to show damages to both real and personal property accruing between 1874 and May, 1883. *Held* that, as plaintiff had not owned the premises prior to its incorporation, it could not recover damages which had happened to its predecessor. Sweaney v. U. S., 22 N. W. Rep. 609, 62 Wis. 396, disapproved.

2. UNITED STATES—CONSENT TO BE SUED—REPEAL OF STATUTE.

If the national government authorizes the commencement of suit against it to recover damages caused by its acts, and subsequently, but after suit brought, repeals the statute authorizing suit against it, the recovery in such suit is limited to the time during which the consent to sue existed, and cannot include damages sustained after the enactment of the repealing statute.

**3. EMINENT DOMAIN—FLOODING LANDS—STRUCTURES WITHIN BANKS OF NAVIGABLE RIVER—PROVINCE OF JURY.**

In a proceeding to ascertain the compensation payable by the national government for flooding lands by the construction and maintenance of a dam to improve the navigation of a river, the question whether the lands, docks, wharves, piers, and structures affected by a rise of water lie within the banks of the river is a question of fact to be determined by the jury, as is also the further question whether any part within the banks of the river is an obstruction to navigation.

**4. NAVIGABLE WATERS—"BED OF RIVER" DEFINED.**

The bed of a river is a definite, and commonly a permanent, channel, and is the characteristic which distinguishes the water of the river from mere surface drainage, flowing without definite course or certain limits, and from water percolating through the strata of the earth, both of which are not subject to riparian rights, but form part of the realty, and belong exclusively to the owner of the realty. The banks and the soil which is permanently submerged form the bed of the river.

**5. SAME—"BANK" DEFINED.**

The bank of a river is that elevation of land which confines the waters of the river in their natural channel when they rise to their highest, but do not overflow the banks.

**6. SAME—SWAMP AND MARSH LANDS.**

While the banks are a part of the river, the river does not include lands beyond the banks, which are covered in times of freshet or extreme floods, or swamps or low grounds which are liable to overflow, but are reclaimable for meadows or agriculture, or which, being too low for reclamation, though not always covered with water, may be used for cattle to range upon, as natural or uninclosed pasture.

**7. SAME—"LOW AND HIGH WATER MARK" DEFINED.**

Low-water mark is the point to which the river recedes at its lowest stage. High-water mark is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation, and to destroy its value for agriculture.

**8. SAME—RIGHTS OF RIPARIAN OWNERS—DOCKS AND WHARVES.**

The owner of premises bounded by a navigable stream has, as a riparian proprietor, the right of access to the navigable part of the river in front of his premises, and the right to make a landing, dock, wharf, or pier for his own use, or the use of the public; but such structure must not encroach upon navigable waters and vessels, and the commerce navigating the stream must not be impeded in their passage, or precluded from the use of all parts of the stream which are navigable in fact. These rights are property, and the riparian owner is entitled to compensation for their destruction or impairment.

**9. SAME—OBSTRUCTION—DOCK—WISCONSIN STATUTE.**

The construction of a dock extending through shoal water only so far as is necessary to reach the navigable part of a river is not within the prohibition of the Wisconsin statute prohibiting the obstruction of navigable rivers without authority from the legislature.

**10. SAME—DOCK PRIVILEGES—RIGHT TO COMPENSATION—EMINENT DOMAIN.**

If a dock constructed on the bank of a navigable river does not extend into waters which are navigable in fact so as to obstruct navigation, the owner is entitled to compensation for damage sustained to his dock by the raising of a dam to improve the navigation; but if the dock so encroaches on that part of the river which is navigable in fact as to obstruct navigation, and impede commerce, he cannot recover damages for injury to the portion of the dock which so encroaches.

**11. EMINENT DOMAIN—FLOODING LANDS—COST OF FILLING.**

In a proceeding by a lumber company against the United States to recover damages caused by flooding lands forming part of its lumber yard, the company made a claim for filling, which was alleged to have been rendered necessary by the raising of a dam. The land was originally low and marshy, and subject to overflow by freshet, and to render

it fit for use, in connection with the sawmill, it was necessary that it should be filled. The filling used was sawdust, slab, and other material, and it was claimed that the effect of the water set back thereon was to disintegrate and rot it, and that by the action of the water, and the weight of the lumber, the filling was constantly settling, necessitating refilling. *Held*, that in determining the amount of damage the jury must consider the original character of the land, and the consequent disintegration and rotting of the filling, and that the recovery must be limited to such filling as was rendered necessary by the raising of the dam, and the disintegration and rotting resulting therefrom, and not from natural causes.

12. DAMAGES—MEASURE—VALUE OF ARTICLE FOR SPECIFIC PURPOSE.

Evidence was given concerning the value of sawdust, from which it appeared that at one time there was a certain demand in Oshkosh for sawdust, and that the value of it at a particular mill depended upon the nearness of the mill to the locality where it was needed, or the facility with which it could be shipped. *Held* that, in determining the value of the sawdust used for filling, the jury must consider whether the demand included all the sawdust made in Oshkosh, and the location of the plaintiff's mill, its nearness to the market, and the value of the sawdust there.

At Law.    Proceeding by the Paine Lumber Company, Limited, against the United States to ascertain the damage caused to the plaintiff's premises by the raising of a dam at Menasha for the purpose of improving the navigation of the Fox and Wisconsin rivers. Verdict for plaintiff.

In the year 1872 the United States purchased of the Green Bay & Mississippi Canal Company the line of improvement of the Fox and Wisconsin rivers, including all locks, dams, canals, and franchises, excepting the water powers created by the dams, and by the use of the surplus waters not needed for the purposes of navigation, took possession of the same, and since that time have controlled and carried on the works of such improvement. By an act of congress approved March 3, 1875, it was, among other things, provided: "In case any lands or other property is now, or shall be, flowed or injured by means of any part of the works of said improvement heretofore or hereafter constructed, for which compensation is now, or shall become, legally owing, and in the opinion of the officer in charge it is not prudent that the dam or dams be lowered, the amount of such compensation may be ascertained in the mode provided for by the laws of the state wherein such property lies." The plaintiff being the owner of a sawmill, sash, door, and blind factory, warehouses, and piling grounds situate in the city of Oshkosh, on the east side of the river, containing 22 and a fraction acres of land, and also the owner of a sawmill, yards, and piling grounds on the west side of the river, containing 5 and a fraction acres of ground, which it claimed were damaged by flowage caused by the dam at Menasha, at the outlet of Lake Winnebago, on the 1st day of February, 1887, filed its petition in accordance with the laws of the state of Wisconsin, as applicable in case of lands taken by a railroad company, for the purpose of having the damages claimed to the real estate and personal property thereon appraised and paid. Commissioners were appointed, and in 1889 an award was made by them, whereby there was awarded to the plaintiff the sum of $65,561 as damages. From this award the United States appealed to the circuit court of Winnebago county, and the cause was afterwards, under the provisions of the act of congress, approved September 30, 1890, removed into the circuit court of the United States for the eastern district of Wisconsin. Such cause was tried before the Honorable James G. Jenkins, J., and a jury.

Evidence was produced tending to show that in 1874 the dam at Menasha, which was so purchased by the United States, was raised by private parties, claiming to be the owners of the water power created by the dam, by placing 15 inches of movable flushboards upon the crest; that in 1881 a large amount

of stone was placed upon the dam by the mill owners, which raised it from 18 to 20 inches above the height of such flushboards, and resulted, in connection with severe and unusual rains, in a disastrous flood upon the country above. In the winter of 1882 these stones were removed, or leveled back, and in the summer of that year the government took exclusive control of the dam. At this time it was found that in some way, and at some time subsequent to 1874, the dam had been made solid to the same height as the flushboards placed thereon in 1874. For the purpose of reducing the waters of Lake Winnebago the United States lowered the crest of the dam, as it was found in 1882, 18 inches, or to a point 3 inches below the crest of the dam in 1874, and placed thereon 18 inches of movable flushboards, which restored the dam, with the flushboards, to the same height that it was in 1874 with the flushboards on. In 1886 the old dam was entirely removed, and a new one built, by the United States, to the same height as the dam of 1874, with its flushboards, and to the same height as the dam of 1882, with its flushboards.

The plaintiff corporation was organized in May, 1883, succeeding the firm of C. N. Paine & Co., which had owned the premises claimed to be damaged from about the year 1855. The statute which authorized these proceedings was repealed February 1, 1888. The plaintiff offered to show damages accruing between 1874 and May, 1883, both to the real and personal property. Such evidence was excluded by the court on the ground that the plaintiff had no ownership prior to its incorporation, and could not recover for any damages which had happened to the firm of C. N. Paine & Co., its predecessor; the court declining to follow the rule laid down in Sweaney v. U. S., 62 Wis. 396, 22 N. W. Rep. 609. The plaintiff also offered to show damages which had accrued subsequent to February, 1888, but the court excluded the evidence on the ground that no damage could be recovered after the repeal of the statute. Evidence was received as to damages between May, 1883, and February, 1888. The plaintiff claimed to have proven damages during such time as follows:

| | |
|---|---|
| To manufactured lumber | $ 9,300 00 |
| Glass | 1,000 00 |
| Loss of use of mill | 5,100 00 |
| Expense of raising mill and machinery | 5,656 45 |
| Cost of filling 28 acres to a height claimed to be necessary to bring the premises above high-water mark, including the cost of filling made necessary by waste caused by high water | 60,486 00 |

The jury returned into court January 10, 1893, with a verdict for the plaintiff for $5,588.34. Such other facts as are necessary to understand the charge are fully stated by the learned judge therein.

Charles W. Felker and Moses Hooper, for plaintiff.

A. E. Thompson and Elihu Colman, for defendant.

JENKINS, District Judge, (charging jury.) The trial in which we have been engaged has taken considerable of your time, and of the time of the court, and is an important one, both to the public and the private parties here litigant; and if, with the assistance of counsel and of the court, you can arrive at a just conclusion upon the merits of this controversy, the time expended in the trial will have been well employed. A large mass of testimony has been taken, to which you have given careful and intelligent attention. Notwithstanding that large mass of evidence, the propositions of law involved are not many, and are not, as the court views them, extremely difficult of solution. And if you will carefully listen to such charge as the court thinks it its duty to address to you, and will endeavor to apply the law as the court shall give it to you, to the facts as you may ascertain them to be, I think you

will have no great difficulty in arriving at a correct solution of the rights of this case.

In 1849 a dam was constructed across the "Menasha channel," as it is called, or the outlet of Winnebago lake. That dam was constructed by private parties under authority of the legislature of the state. It remained substantially as it was constructed, with reference to its effect upon the waters of Lake Winnebago, down to 1866, or say the 1st of January, 1867. This proceeding by the plaintiff here having been commenced in the year 1887, the owners of that dam, whether the private owners or their successors, (finally the United States of America,) had acquired by prescription the right to maintain that dam, and to set back the waters of Lake Winnebago to the height that that dam would set them back, and no one had a right to dispute the right of the owner of the dam to so set back those waters. They had been set back, if at all, by that dam, for a period of 20 years, from 1849; and, if the waters of Lake Winnebago or of Fox river have not been set back by any improvements or additions to the dam to a greater height than they were set back in 1866 by the dam of 1849, there can be no recovery here by the plaintiff, because the right so to set them back had become fixed by prescription,—by the fact that they had been so set back for a period of 20 years.

In 1872 this dam was purchased by the government of the United States of America, and it had the right to set back the waters of Lake Winnebago and of the Fox river as they were set back by the dam it then purchased at that time. The United States of America, being sovereign, cannot be sued with respect to anything that it does, except by its own consent; and on the 3d day of March, 1875, by an act of the congress of the United States, approved by the president of the United States on that day, the government provided that whenever, in the prosecution and maintenance of the improvement of the Fox and Wisconsin rivers, it became necessary or proper, in the judgment of the secretary of war, to take possession of land, or right of way over lands for canals and cut-offs, or to use any earth, quarries, or other material lying adjacent to the line of the improvement, and needful for its prosecution or maintenance, possession might be taken by the officers of the United States, and they might use the same, after first paying, or securing to be paid, to the owner, the value thereof, to be ascertained in the mode pointed out by the laws of the state of Wisconsin. And it was further provided that "in case any land or other property is now, or shall be, flooded or injured by means of any part of the works of said improvement heretofore or hereafter constructed, for which compensation is now, or shall become, legally owing, and in the opinion of the officer in charge it is not prudent that the dam or dams be lowered, the amount of such compensation may be ascertained in like manner." Under that provision of law the plaintiff has taken the necessary steps to have its claim that its lands are flowed, by reason of this improvement, over and above what they were flowed in 1866 by the dam of 1849, determined in this proceeding, and the sovereign, having assented, by

this act, to be brought into a court of justice, is here to meet that claim; and the question for your determination is, under the charge of the court, whether, and to what extent, that claim is justified by the law and the facts.

The plaintiff acquired title to the premises in question in the spring of 1883,—to the part on the east bank of the river, in May; and the part on the west bank of the river, in June. The discrepancy in the time of acquiring the title does not cut much, if any, figure in this case, and we may take it as the spring of 1883. The court has ruled during the trial that the plaintiff, if entitled to any damages at all, is limited to those damages which accrued between the time that it took title to the property, in the spring of 1883, and the time when this act was repealed by the congress of the United States,—February 1, 1888; and it so charges you now, that the claim of the plaintiff, if valid in the law or in fact, must be limited to the years 1883, 1884, 1885, 1886, and 1887, because the sovereign power, having withdrawn its consent to be sued, and to be held responsible for these damages, cannot be compelled to respond in a court of justice beyond the time when it has withdrawn its consent. But, as to any injury inflicted during the time that that consent was effectual, it can be held responsible.

The first question for you to consider is whether the Menasha dam, during the period between 1883 and 1888, raised the waters at the Paine mill to a greater height than that water was maintained in 1866 by the dam of 1849. If it did not, then your verdict should be for the defendant, and you need inquire no further with respect to the other questions in the case. This question, gentlemen, depends upon several considerations. The court does not propose to enter elaborately into any discussion of the facts of the case, because it has observed that you have given to them an intelligent attention, and have taken great interest in the facts as they have been disclosed to you, and they have been ably argued to you by counsel on both sides, but I shall content myself with calling your attention to certain facts which may aid you in arriving at a determination of that question; and I desire to say here that, in whatever the court may say upon the facts of the case, it does not wish you to understand that it expresses any opinion as to how the fact should be determined as to whether or not the waters were raised by the dam in question. That is a question of fact for you to determine upon the evidence, as it shall convince your judgment.

In 1875, after the United States government had become the owner of this dam, proprietors of mills interested in maintaining this dam performed certain work upon it, presumably without the knowledge of the officials of the United States. But if the government of the United States maintained that dam thereafter, with such additions, alterations, and elevations as private parties had made to it, the United States is responsible for the consequences, and, if there have been any injury, is responsible to the parties injured. The dam of 1875, as so constructed and altered by private parties, was, with the movable flushboards put upon it,

some 15 inches higher than the dam of 1849. Some time between 1875 and 1882—just when is left, I believe, uncertain—those flushboards were permanently attached to that dam. So that the dam, as it was in 1882,—the commencement of the year,—was 15 inches higher than the dam of 1849.

Now, certain work was done upon that dam in 1882. Mr. Herman, the engineer then actively in charge of the work, states that the flushboards were removed that had been permanently affixed,—those 15-inch flushboards; that the crest of the dam was cut down 3 inches, and movable flushboards supplied, of 18 inches in height. So that, if these flushboards were maintained on the dam permanently thereafter, that dam would be 15 inches higher than the dam of 1849. Between these dates —1875 and 1881—these mill proprietors, or certain of them, had placed some 82 or 83 cords of stone upon the work, which, it is claimed, raised that dam higher than its crest. These stone, or some of them, were removed in 1882. It will be for you to say, gentlemen, as a question of fact, whether these stone were all removed, or whether those that remained, if all were not removed, raised that dam above the 15 inches that it was higher than the dam of 1849. That is a question of fact, which I need not take time to elaborate to you. It is claimed on the part of the defendant that these stone were substantially all removed, or, if not all removed, that the true height of the dam was shown by the levels taken at that time to be 15 inches higher than the dam of 1849, and no more. It is claimed on the part of the plaintiff that these stone were not all removed, and that those that were left raised, and presented an obstruction to the flowage of water, —that obstruction being higher than that 15 inches above the dam of 1849. This dam so remained until 1886, when it was in fact raised to an elevation equal to the height of those flushboards, and that elevation made permanent, and sluice gates put at the bottom of the dam to let out the water in times of freshet and of high water. This last change would, of course, make that permanent dam higher, but for the fact that the effective result of it would depend upon the use made of those sluice gates to let out the water in time of freshet, of flood, or high water. That work was substantially done in 1886, so that only comprehends one year of the time. Some time between 1875 and 1881,—it may have been in 1867; there has been some dispute as to the time; but at some time before 1881, and after 1866,—you will remember that that dam, to one-half of its width across the river, had been converted into a permanent embankment, the height being equal to the other part of the dam with the flushboards upon it. That you will take into consideration in determining the question of whether, after 1866, or after this right of prescription accrued to the owners of the dam, a change had been made which tended to set back the waters of the lake, and of the Fox and Wisconsin rivers. The "spill," as it is termed, over the dam, had been shortened by about one-half of its width.

Then comes the question whether that dam of 1882 caused the waters of the lake and of the Fox river to be set back. If the height to which it was raised by means of those flushboards was permanent, it would not necessarily follow that the structure itself set back the waters to the extent of its height. That would depend upon the quantity of water that was flowing towards that dam, and the height of the water, and not altogether upon the height of the dam. Now, in ascertaining the fact, you must have regard to all the evidence that has been given in the case. You must regard the evidence on the part of the plaintiff carefully, and analyze that, as well as all the evidence on the part of the defense. The plaintiff has given evidence tending to show that the waters of the Fox river have raised, and have remained for a longer period of time upon the lands. You will consider the means of observation of the parties so testifying,—whether it is guesswork upon their part, or a statement of a fact which they have observed, and their means of knowledge; whether or not they had the means of measurement, and the accuracy of those measurements, if they had. You have also testimony upon the part of the defendant which, it is claimed, tends to show that these waters have not been raised by the dam. They have given in evidence readings taken from this "Deuchman gauge," as it is termed, which has a tendency to show, as it is claimed, that as a matter of fact the waters have not been so high, or have been no higher since the dam of 1882 than they were prior to that time, —than they were during the existence of the dam of 1849. And in considering the value of that testimony, and its reliability, you are also to consider the question of the reliability of this Deuchman gauge. This gauge has been described to you. It was kept by the owner of the mill. It has been the standard adopted by the government since it came into possession of these improvements, upon which the government has acted. The reliability of that gauge—as to whether it has been changed with respect to its location, as to its accuracy—is a question for you to determine. It has been attacked by the plaintiff's counsel as unreliable, and as one manipulated by the mill owners—not by the government of the United States, but by mill owners—at the time it was maintained before the government came there, in anticipation of suits and claims for damages, and that it was read at that time with respect to, and in anticipation of, these claims. It is for you to say, gentlemen, whether the evidence in this case proves or sustains that claim; whether the facts, as disclosed, as to the condition of the water in the Fox river, prove, or do not prove, that that gauge is unreliable. If it is a standard that has been so manipulated in the interest of the mill owners, then the readings of that gauge before the time when the government took possession of these works, and had charge of them,—acquired the title to them,—must be considered in the light of such fact and evidence. If it is contrary to actual fact with respect to the height of water at the Paine mill, as you may de-

termine it to be, it would have a tendency to show that the gauge was unreliable. But if the testimony does not satisfy you that that gauge has been manipulated,—does not satisfy you that it has been kept otherwise than as an honest gauge of the height of the water,—then you must consider it as reliable evidence with respect to the various heights of water during the time that these readings speak. The question of the reliability of the gauge, and the credit to be given to it, is one of fact, for you to determine, and rests solely with you. If, following the readings of that gauge, you shall come to the conclusion that the water has not been raised by that dam of 1882, and has not been raised by the dam of 1886, then, equally, the plaintiff is not entitled to recover, however its injury, if it has sustained any, may have been occasioned.

And in this connection the court will advert for a moment to the order of Col. Marshall, concerning which much has been said, although, being made in October, 1886, it can have reference to but one year,—the year 1887. Col. Marshall says in his order that the sluiceways in the dam are placed by the government to prevent damage by floods in Lake Winnebago. "The term 'flood' is to be considered to refer to all stages of water above an ordinary high-water stage. The ordinary high-water stage will be taken as the mean high-water stage for the past 28 years, as shown by the readings of Deuchman's gauge at the foot of Lake Winnebago; rejecting 1860, when the water was abnormally low, and 1881, when the water was excessively high. This mean annual high water for 28 years is +42 inches on Deuchman's gauge, or +3' 6" above zero. You will, therefore," says Col. Marshall, "begin to open the sluiceways in the Menasha dam when the water approaches within two inches of this height, or at 3' 4" on Deuchman's gauge, and as far as the capacity of the Fox river below Menasha, and the security of the government works, will allow. You will maintain the level of Lake Winnebago at or below the ordinary high water level of 3' 6" on the Deuchman's gauge by opening or closing the sluiceways in the Menasha dam." That order does not require the officers to maintain it at 3' 6", but at or below 3' 6", depending upon the necessities of the works below the Menasha dam. The object of the order, as you will observe, is that the water of Lake Winnebago and of the Fox river, at mean ordinary high-water mark, shall not be above the mean annual high water for the 28 years preceding.

Now, what did that dam of 1882 do with respect to the raising of the waters in Fox river? That depended, not wholly, as the court has observed, upon the height of the flushboards, for the flushboards may or may not have been on there at times of high water. Whether that dam would be effective to raise the water at the dam, and hold it there at the height of 15 inches above the dam of 1849, would depend in part upon whether the flushboards were on. I say in part, because, you will remember, up to 1886, one-half in the width of this dam was a per-

manent embankment to the height of 15 inches above the dam of 1849. You will, in determining this question of fact, consider first to what height, if the water was maintained at the height of the flushboards on the dam, and the flushboards were on, it would be effective to set back the water at the Paine mill, and to what height it would be effective if the flushboards were off,—taking into consideration the fact that one-half in width of this dam had become a permanent elevation of 15 inches above the dam of 1849, and also taking into consideration other circumstances, as to the rainfall, as to the melting of snow, which have been detailed by the witnesses. Tables have been given you of the rainfalls during the period. You will also consider the fact—historical fact—that the country north of this, and to the west of it, the waters of which are contributory to this Fox river, had been developed. Timber had been cut down, the land had been improved, and you will determine the fact—which seems to be disputed here—whether the felling of the timber, and cultivation of the ground, does or does not tend to release the water which has been held in the ground when the land was in a state of nature, and whether that cultivation does or does not release the water so that a larger quantity of water is coming down than formerly came when the land was in a state of nature. You will also consider and determine the question whether the fact, if it be a fact, that parties along the river have built docks out, and have narrowed the channel of the river, has caused the waters to be held back and dammed up, in a measure, so that the flow of water has been retarded, and has spread over upon the lands of the plaintiff. You will also consider whether or not there were obstructions in the river at or above the plaintiff's premises, in the way of piles, or other obstructions put in there, not by the United States government, but by others, which had a tendency to hold back the water, and spread it over the premises of the plaintiff. You will see, therefore, gentlemen, that there are many circumstances which you should consider in arriving at a just conclusion as to whether this dam of 1882 did or did not set back the waters of Lake Winnebago upon the premises of the plaintiff.

With respect to the dam of 1886, in this connection, you will remember that the object of these sluiceways was to lower the water in time of freshets, and prevent floods; and you will also say, as to the year 1887, whether or not that dam of 1886 has set back the water, either by reason of the dam itself, or the management of it with respect to the sluiceways, over and above the height to which water was set back in 1886. If you shall come to the conclusion that during those five years, from 1883 to 1888, this dam, as it was maintained from 1882 to 1888, did not set back the waters upon the premises of the plaintiff more than they were set back in 1866; if you shall find that the water was higher on the plaintiff's premises during those years than it was in 1866,—yet if that was caused, not by the dam, but from other causes which the court has mentioned, and the evidence of which is before you, then it will be your duty to find for the defendant, because the act of the

government in such case would not have caused any injury to the plaintiff. But if, on the other hand, you shall find that in fact this dam of 1882 and 1886 did cause the waters of the Fox river to rise higher upon the land of the plaintiff than it was wont in time of freshet, and it was caused by the dam, and has been retained there by the dam longer than it was usually retained, and longer than it was retained by the dam of 1849, and in 1866, then it will be your duty to proceed further, and ascertain whether, upon the other questions in the case, the plaintiff is entitled to damages, and to what damages.

It is insisted on behalf of the government that the plaintiff cannot recover here for any such damages, if any were occasioned, because it is claimed that the premises which were affected by that rise of water, if it was raised by the dam, lie within the banks of the river, and that, therefore, the government of the United States, having the right to improve the navigation of the river, had a right to do what was necessary to be done in that regard, and that no one had a right to any part of the soil within the banks of the river, and that no docks, wharves, piers, or structure erected within the banks of the river, and injured by this improvement of the navigation of the river, can sustain injury by reason of that improvement for which the government can be called to account. This proposition involves an interesting and important principle of law, which, as the court considers and determines it, leaves it in part a question of fact for the jury to determine upon the evidence in this case,—whether this property claimed by the plaintiff is within the banks of the river, and, if any part of it is within the banks of the river, whether that part is or is not an obstruction to the navigation of the river.

A river consists of the bed, the water, and the bank. The bed, which is a definite, and commonly a permanent, channel, is the characteristic which distinguishes the water of a river from mere surface drainage flowing without definite course or certain limits, and from water percolating through the strata of the earth, both of which are not subject to riparian rights, but form part of the realty, and belong exclusively to the owner of the realty. The bank of a river is that elevation of land which confines the waters of the river in their natural channel when they rise the highest, and do not overflow the banks. And, in that condition of the water, the banks, and the soil which is permanently submerged, form the bed of the river. The banks are a part of the river bed; but the river does not include lands beyond the banks which are covered in times of freshet or extreme floods, or swamps or low grounds which are liable to overflow, but are reclaimable for meadows or agriculture, or which, being too low for reclamation, though not always covered with water, may be used for cattle to range upon, as natural or uninclosed pasture. Fresh-water rivers, like the Fox river, may rise and fall periodically at certain seasons, and these have defined high and low water marks. "Low-water mark" is the point to which the river recedes at its lowest stage. "High-water

mark" is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation, and to destroy its value for agriculture.

Now, apply these principles, gentlemen, to the facts in this case. It is claimed on the one side that the bank of this river on the east was about the line of the present Lake Shore & Western Road. It is claimed upon the other side that that was not the bank of the river; that that was high ground, but that between that line and the true bank of the river was low ground, covered in times of freshet with water, but which gradually and naturally drained off, leaving the property fit for pasture; that it grew grass; and that that land was real estate, and not the bed of the river. You are to look at the character of the vegetation which was upon that bottom land, as the court may term it, to settle in your minds whether that was really part of the bed of the river, or whether it was simply low ground, which in times of freshet or of floods was overflowed, and afterwards drained. In other words, to again recur to the definition of "high-water line," did the water so act upon the soil by covering it for such sufficient periods as to deprive it of vegetation, and destroy its value for agriculture? The soil which is so impressed is the soil between low-water mark and high-water mark. So you are to determine from the evidence in this case whether high-water mark was at the elevation which the plaintiff claims was the bank, or that higher elevation by the railroad, which the defendant claims was the bank. You are to take these premises as they existed, and as they are shown to you by the evidence to have existed, to determine whether the water—the ordinary mean high water of that river—remained there, and remained there so long as to unfit that land for pasturage or agriculture, and to change entirely the soil. Was it that character of land which by action of the water so permanently remaining upon it, when it reaches its high-water mark, would be deprived of its usefulness as land, and become simply what we all know to be the bed of a river? If it was not so impressed by the water; if it was merely covered by freshets or by floods, which receded at once, or remained there but temporarily, and, after the water receded, grass grew upon it,— cattle pastured upon it,—then that land did not constitute the bed of the river, but was simply low, marshy land, title to which is in the owners of the property, and was part of the realty, which the owner of that realty had a right to improve. Can it be said truthfully that low lands which we find along the rivers of the west, which are flooded in times of freshet, and then comparatively dry for the remainder of the year, are part of the river bed? Is it not true that such lands can be cultivated, and belong to the owner, who owns at least to the water's edge? And if you find that these premises of the plaintiff were such lands, were low lands, lying beyond the bank of the river, and not within the banks of the river, lying beyond the point of high water when the river does not overflow its banks,—for rivers frequently overflow their banks,—then it was real estate; then it was the property of the plaintiff, which it had a right to improve; and if it has

been damaged the government of the United States must make just compensation for the injury it has occasioned, if it has occasioned any.

And again, gentlemen, it is claimed on the part of the United States that even assuming the bank of the river to be as claimed by the plaintiff, if the plaintiff has docked out beyond that bank, beyond high-water mark, that, as the government had a right to improve this river for the purposes of navigation, the plaintiff cannot recover for any injury to structures, docks, or to filling that have been extended beyond the bank of the river. And that brings us to the consideration of the question of riparian rights. It is not essential for the purposes of this case to determine or to declare whether or not the plaintiff owned the soil under the water to the thread of the channel; for, by reason of its ownership of the premises bounded by a navigable stream, the plaintiff possesses the rights of a riparian proprietor, among which are the right of access to the navigable part of the river from the front of its premises, and the right to make a landing, a dock, a wharf, or a pier for its own use, or for the use of the public, subject, however, to such restrictions as may, by law, be imposed for the protection of the rights of the public. But in so doing the plaintiff must take care that it does not encroach upon navigable waters, and that vessels, and the commerce employed in navigating the stream, are not impeded in their passage, nor precluded from the use of all parts of the stream which are navigable in fact. This right, as Mr. Chief Justice Ryan, of the supreme court of Wisconsin, aptly defined it, "necessarily implies some intrusion into navigable water at peril of obstructing navigation. This intrusion is expressly permitted to aid navigation, and expressly prohibited to obstruct navigation. It is impossible," he says, "to give a general rule limiting its extent. That will always depend upon the condition under which the right is exercised; the extent and uses of the navigable water; the nature, extent, and object of the structure itself. A structure in aid of navigation which would be a reasonable intrusion into the waters of Lake Michigan would probably be an obstruction of navigation in any navigable river within the state. A logging boom which would be a reasonable intrusion into the waters of the Mississippi river would probably be an obstruction of navigation in most or all the logging streams within the state. The width of a river may justify a liberal exercise of the right of intrusion, or may exclude it altogether. Its extent is purely a relative question." The construction of a dock extending through shoal water only so far as was necessary to reach the navigable part of the river is not within the protection of the state statute to which the court has been referred, forbidding the obstruction of navigable rivers without authority from the legislature.

You will therefore consider if there has been any intrusion into this river by the plaintiff's premises, beyond this high-water line, as you may determine it. You will consider the object, the nature, and the extent of that intrusion, and whether it obstructs the navigation of that river; whether it goes so far, and includes that part

of the river which is navigable in fact,—navigable for crafts usually plying its waters. If this structure, this dock, has been extended beyond the line of navigable water so that it becomes an intrusion to navigation, an obstruction to the commerce, taking into consideration the locality, the commerce that plies there, the width of the river,—if it has extended into waters navigable in fact,—then, so far as it extended, the plaintiff cannot claim damages for injuries to that property by act of the government in improving the navigation of that river. But if it has not extended into navigable water,—waters navigable in fact,—if it is not an obstruction to navigation, then that property cannot be injured without compensation being made for the injury. This riparian right is property, as has been determined by the supreme court of the United States, and is valuable, and, although it must be enjoyed in due subjection to the rights of the public, it is a right of which, when once vested, the owner can only be deprived in accordance with established law; and if that right has here been injured by means of any part of the improvement constructed or maintained by the United States under the act of March 3, 1875, the defendant must respond for any such injury occasioned between the spring of 1883 and the repeal of the act, on the 1st of February, 1888. The right of the government to improve the navigation of a navigable river is paramount, and, as against the exercise of that right, the plaintiff had no right to obstruct navigation by encroaching upon the navigable part of the river; that is, that part of the river within its bank that was navigable in fact. And if the plaintiff's dock so encroaches, in whole or in part, the plaintiff cannot recover for any injury to the structure, or that part of it so encroaching, caused by the act of the United States in the improvement of the navigation of the river. But the plaintiff had the right to construct or maintain its dock in the river so far as to reach that point which was navigable in fact. So that you see the question comes down, as a question of fact for you to determine, as to the extent to which the dock has encroached upon that part of the river which in fact was navigable; how far it has extended beyond the bank which held the water, without the bank being overflowed in time of ordinary high water. Upon this question of fact, as to whether this dock has encroached into water navigable in fact, you will bring to bear your common sense, and your best judgment. You have been there. You have seen these premises. You have heard evidence of the depth of the water at the dock. It is for you to say, as you may determine these facts, whether that dock has or has not encroached upon that part of the river which was navigable in fact. If it has not, then, if, under the consideration of the other branches of the case, you find it has been injured by act of the United States, and by the maintenance of this dam, then, so far as it has been injured by that act, the plaintiff would be entitled to recover.

I now come, gentlemen, to the consideration of the question of the damages which the plaintiff is entitled to recover, if at all.

A large part of the plaintiff's claim is made up of filling; and the court will make a few observations to you, and give you a few instructions, upon that subject, which you may apply to the facts as you may find them. You will remember that, if the plaintiff is entitled to recover at all for any filling upon these premises, it is only entitled to such filling as it has done to make these premises as much higher as the water has been raised by reason of the dam in question over the height to which it was raised at and prior to 1866; the filling done by the plaintiff during the years 1883 to 1888; the filling rendered necessary by reason of the elevation of the water on that land by the dam in question, if it was so raised by the dam. You will consider the question first, if you shall determine that the water was raised and kept there by the dam in question to the extent of a foot or to whatever extent you may find it to have been raised, if it was raised; then, if it was necessary, by reason of the rise of the water a foot, that it should be filled a foot, to the extent that it was necessary, and to the extent the plaintiff did the filling, it would be entitled to recover what that filling was reasonably worth. You must consider, gentlemen, in this connection, the original character of this land, if you should find that it was land. It was low, marshy, swampy land. To be rendered fit for use in connection with a lumber mill, it was essential that that land should be filled. You will remember, also, that they were premises that were annually overflowed by freshet. You will remember that it is claimed that the effect of water upon such filling was to disintegrate the filling, and to rot it, and that that kind of filling was constantly and yearly settling by reason of the action of the water upon it, and the pressure of the lumber from above, so that it, either annually or at stated periods, required refilling. Now, because the government of the United States has raised the water upon these premises, and retained water upon these premises longer than it was wont to be retained, if it has so done, is no reason why the government should pay for the filling that was originally done, or refilling that was rendered necessary by the disintegration of this filling, and the rotting of the filling. That was a natural imperfection in the nature of the ground, and the nature of the material with which it was filled. It is only such filling as was rendered necessary because of the increased height of the water which was put there, and the increased damage, if any, caused to the filling by the increased height of the water. You must be very careful, gentlemen, in the consideration of this question, if you should come to it, to understand, and have in your minds, thoroughly, the facts with respect to these premises,—the necessity which constantly existed of refilling them, for the reasons that have been stated,— and limit the recovery of the plaintiff, if it is entitled to recover at all, to just such filling as it did, as was rendered necessary to protect itself against the rise of the water which was caused by this dam, if it was caused at all. If there were other matters which caused the rise of this water, and the dam did not, and therefore the filling was rendered necessary, the government of the United

States ought not to pay for it. But if it caused a rise of water which rendered imperative a certain amount of filling, and the plaintiff has done it, the plaintiff is entitled to recover for what it so did.

The court will also say to you, with respect to another large claim of the plaintiff,—the waste of filling from other than natural causes, two inches a year,—it must be very difficult for any one to estimate that the waste of filling actually put on these premises during those years was so many inches a year, attributable solely to the rise of the water, and the retention of the water upon these premises for a longer period. You must bear in mind that the whole foundation of these premises was wet; that there was constant disintegration going on, irrespective of the question of the raising of the water by this dam; and you must determine, if you can, from the testimony, according to your best judgment, whether or not there has been waste of that filling which was put there, by reason of the increased height of water, over and above the waste which would have been created there by the action of the water which would have come upon these premises without this dam raising it above the dam as it was in 1866. It will be a very difficult question for you to arrive at the proper and just and accurate conclusion upon. You are not to guess at it. You are not bound by estimates of the parties upon it. You must, by the evidence, ascertain in some way, if you can, if there has been such waste by such increase of water, and the extent of it, and allow for it. You must also regard the character of the filling. A great deal of it was sawdust. It is said there was some slab and other material. Was the filling put there by the plaintiff necessary to protect itself from the increased height to which this dam raised this water, or was it put there in the natural filling up of such premises, for the use of the mill? Was it necessitated by this rise, and was it so done by the plaintiff for the purpose of protecting itself against that rise of the water? Then as to the value of this material. Evidence has been given touching the value of sawdust. It seems that at a certain time there grew up a certain demand in Oshkosh for sawdust, and the value of it at a particular mill would seem to have depended upon the nearness of the mill to the locality where it was needed, or the facility with which it could be shipped. How great that demand was—whether it was general, so as to comprehend all the sawdust that was made in Oshkosh, or whether it was limited in extent—will be for you to say. You will consider the location of the Paine mill, its nearness to the market, and the value of that sawdust as it was there; whether it was of the value stated, or not. And in this connection you will also consider the evidence which Mr. Paine gave here upon the stand, and compare that evidence with the evidence which he gave before the commissioners, which has been presented here. Consider the circumstances under which the evidence was given in both instances; and if there is any discrepancy, or wide discrepancy, in his statements, either as to the quantity of filling, or time of filling, or as to the value of the filling, you will consider that circumstance in determining how much credibility is to be

given to the statement by him with respect to the value of that filling, or the amount of filling that was done. And, while these commissioners before whom that testimony was taken were officers appointed by the court to ascertain damages, they were officers, it is proper for me to say to you, who were authorized to take testimony under oath; and one who undertakes, in a court of justice, or before commissioners appointed by a court, to state his claim, and the facts of his claim, under oath, ought to know what he is testifying to, and to testify to it deliberately; and the statement he makes of facts ought, in the main, to correspond with the facts that he states under oath with respect to that claim in any other court, or before any other tribunal. Mistakes may be made. The human mind is not perfect, and we must allow somewhat for error of judgment; but if there be any wide discrepancy, either as to the amount of filling, or as to the cost of filling, it will be for you to say, gentlemen, on a comparison of that evidence, to which statement you will give credit; all the while considering that you are to take all the testimony in the case into consideration in determining and arriving at the fair and proper price to be given for that filling.

There is an item here charging for raising the mill in the winter of 1886. You will determine whether the raising of that mill was rendered necessary by the increased high water upon this land caused by the Menasha dam, if it was so caused. Was that mill raised for that purpose? Was it raised to protect it against the increased high water? And in considering that you will consider what the stage of water was at that time; whether it was necessary, for that purpose, that it should be raised. You will consider the time when it was raised, and all the circumstances surrounding that act, and determine whether the plaintiff raised that mill because of the increased raise, if any, occasioned by the dam of 1882.

Then there is an item of repairing and raising tramways in 1886. These tramways were put down in 1871. You know what they were. You have seen them. You know the uses to which they were applied. You must consider their age. Consider the uses to which they have been put. You must consider the necessities of the plaintiff with respect to the means by which lumber was to be handled, and you are to determine whether those tramways were laid down because they were injured by this increased rise of water, or whether it was done because they had become worn, and the mill required better facilities for its business. The government of the United States, while it must respond for damages actually imposed upon this property, if you shall find it liable under the facts and the law, is not required to pay for better facilities for doing business, nor for any other injury than that it has actually occasioned. And with respect to the cost of the new tramways, which has been testified to here, the remarks which the court made to you with respect to the testimony of Mr. Paine before the commissioners equally applies.

With respect to this damage to lumber in 1886. In that connection you will consider from the readings, and from the evidence

in this case, and determine how high the water came in that year, compared with previous years, and whether that damage was or was not occasioned by this rise of water, if any, caused by this dam. If it was so occasioned, then for the damage actually resulting the government ought to render compensation; but if the water was not higher in 1886 than in 1885, 1884, 1883,—for which years no damage is claimed,—then you will determine what caused that damage; whether it was this increase of water, or whether it was rains, and the staining of this lumber by reason of murky, hot weather coming on afterwards. In other words, was this injury to the lumber occasioned by other causes than the mere additional elevation of water upon the land? The same remarks will apply, and is all the court need say to you, in regard to the damage to shingles and glass.

There is only one observation with respect to the west side that is peculiar to that side; that is, loss of time occasioned by mill lying idle on account of high water. First, was that mill idle because of high water, or did it remain idle because the owner was not ready to operate? If it remained idle because he could not get the right kind of logs to manufacture, or for any other purpose, if on its own motion, and at the will of its directors, it remained idle for any purpose other than because of this extra high water, if there was any, then the government ought not to be obliged to pay for that mill remaining idle. The government is only liable if that mill remained idle because it had placed water upon those premises, by reason of this dam, higher than it would have been by the dam as it was in 1866, and only for the time it remained idle because of this additional elevation of water. As to the value of the use of the mill per day, you will, of course, be governed by the testimony, exercising your good judgment as to whether the price charged is exorbitant or not.

In the consideration of all the evidence in this case, gentlemen, you have heard the different witnesses under oath. You are to judge of the credibility of their evidence from their appearance and manner upon the stand. You are to inquire, and have the right to inquire, whether they are in any way interested in the result of this suit, and to take that interest into consideration in determining to what extent you will credit their evidence. It is not the volume of evidence that counts. It is the character of the evidence, and character of the witness that gives the evidence. And the court will make this further observation to you,—not that it deems it absolutely necessary, because it thinks you are sufficiently intelligent to know that the consideration against which I shall warn you ought not in any way to influence your verdict: This is a suit between a private corporation and the government of the United States. It should be tried and determined, gentlemen, just as a suit between two private individuals. Because the United States of America is a great and wealthy nation is no reason why the plaintiff should be

awarded one cent more than it is entitled to, and is no reason why the plaintiff should not recover all that it is entitled to. You are to give to the plaintiff nothing, and you are to withhold from the plaintiff nothing, because the defendant is the United States of America; and you are to give or withhold nothing because it is a claim by a private corporation against a public corporation, —against a sovereign nation. But you are to determine this case, and give damages, if you shall find the plaintiff entitled to damages, according to the very justice and right of the case, closing your eyes as to the parties to it, and determining it just as the facts and the evidence require you to determine it,—as they shall convince your judgment.

So that, gentlemen, to resume, if the waters of the Fox river have not been raised, by any operation of this dam, over the extent to which they were raised by the dam of 1849 down to 1866, then this plaintiff is not entitled to recover. If the premises of the plaintiff, claimed by the plaintiff to have been injured, are within the banks of the river, under the principles of law which the court has declared to you, and are within the navigable part of the river,—navigable in fact,—then the plaintiff could not recover for this injury; but if this water has been raised, and the premises of the plaintiff are real estate belonging to the owner, under the law, as the court has declared it, and are not within that part of the river which is within its banks, and is navigable in fact, then, to the extent that it has been injured by the additional rise of water, you should allow such damages as naturally flow from that rise, and the retention of the water upon the premises for the additional time it was retained, if it has been so retained at all. You will carefully look at all the evidence, carefully weigh it, and come to such just and conservative and honest conclusion as the evidence compels your judgment.

Something has been said during the argument with respect to this Neenah dam. The government, whether wisely or not, has undertaken to say that the improvement of navigation in these rivers could be made only by means of dams. Of course, if there was a dam in the Menasha channel, the waters of the lake would be discharged largely through the Neenah channel—if there was a dam in the Menasha channel, and no dam in the Neenah channel. The court does not consider that the Neenah dam cuts any figure in this case at all. If the government has raised the water upon these premises by means of this Menasha dam, then, under the instructions I have given you, if you find the plaintiff should recover, that Neenah dam cuts no figure in the case at all, and will not be considered by you.