PERCY W. HORTON and Others, Appellants, v. NIAGARA, LOCKPORT AND ONTARIO POWER COMPANY, Respondent. (Action No. 1.)

Fourth Department, January 21, 1931.

*Cobb, Cosgrove, Harter & Wright* [*Delos M. Cosgrove, Loren E. Harter* and *Allen S. Hubbard* of counsel], for the appellants.

*Purcell, Cullen & Reynolds* [*Francis E. Cullen, Warren Tubbs* and *Carlos C. Alden* of counsel], for the respondent.

EDGCOMB, J. The scene of this action is laid on the Salmon river, in the town of Orwell, Oswego county, N. Y. The river is especially adapted for the development of hydro-electric power. It rises in the hilly country of northern New York, and flows in a generally westerly direction, emptying into Lake Ontario near the village of Pulaski. The land through which the stream runs is rough and broken, and the soil is stony and unproductive. The hillsides are largely covered with timber. The community is sparsely settled, and a part of the land still belongs to the public. The upper portion of the catchment area forms an elevated basin from which the river drops rapidly for a distance of a mile, when it makes a direct fall of one hundred and ten feet at a point known as the Salmon River Falls. It then flows down a heavy grade, through a deep, narrow gorge, and emerges, some two miles below the falls, onto a flat, which is approximately three hundred feet lower than the basin outlet.

Plaintiffs claim ownership, through their father, Byron C. Horton, who died intestate in 1917, of eight separate parcels of land lying along the river, and allege that in the years 1912, 1913 and 1914 the defendant wrongfully and unlawfully entered thereon, under claim of title, and erected a power house and appurtenances upon two of said parcels, and cut and destroyed many valuable trees growing upon the others.

Parcel No. 1 consists of an island lying between two channels of the river at Bennett bridge. Parcel No. 2 is an irregular strip of land lying along the south shore of the river opposite the island. Parcels Nos. 3, 4 and 5 lie to the west along the south shore of the river. Parcels Nos. 6, 7 and 8 are situated on the northerly side of the stream.

Upon the trial plaintiffs abandoned their claim to treble damages for the cutting of timber on parcels Nos. 3 to 8, and they now concede that the evidence is not sufficient to warrant a finding that they have any interest whatsoever in parcels 4, 5 and 6. The referee has found that the title to parcel No. 3 is in the plaintiffs, but that the defendant has not encroached thereon. That leaves for our consideration the question of who owns parcels Nos. 1, 2, 7 and 8, and, if the title is in the plaintiffs, whether defendant has encroached thereon. It has been found that the defendant owns parcels 2, 7 and 8, and that the title to parcel No. 1 is in the plaintiffs, and that the defendant has encroached thereon to a slight extent. More of these details later.

Prior to December 22, 1905, plaintiffs' father, Byron C. Horton, was the owner of all this property. On that date he deeded to one Charles A. Lux, defendant's remote grantor, certain lands along the river from the falls east to the Post and Henderson lot, in all 318.64 acres, and also certain other property under the following general description, viz.: "Also the land between the brink of the two banks of said river from the lower line of said Falls Lot, i. e., the southwesterly lines of the first parcel above described, to the point down said river where the Blakeman Creek (toward Altmar) empties into said river, excepting however, the island which separates the two channels at Bennett Bridge."

The issue here resolves itself into a determination of just how much land was conveyed to Lux under the expression "the land between the brink of the two banks of said river." If it be determined that the plaintiffs own the island (parcel No. 1), a further question arises as to whether any part of defendant's power house, or structures, have been erected thereon.

Just what is meant by the expression " brink of the two banks? " The banks of a stream have been defined as the permanent eleva-

tions of land which confine the water to its natural channel when it rises to the highest point at which it is still restricted to a definite course. (2 Farnham Water & Water Rights, § 417; *People ex rel. Commissioners* v. *Board of Supervisors*, 125 Ill. 9, 26; *Paine Lumber Co.* v. *United States*, 55 Fed. 854, 864.)

" Brink " is " the edge, margin, or border of a steep place, as of a precipice; hence, a bank or edge, as of a river or pit." (Webster Internat. Dict.)

Plaintiffs contend that the brink of the bank is the top of that portion of the land which technically constitutes the bank, *i. e.*, the high-water mark, no matter how steep the acclivity may be, or how high it may ascend above the water line. Giving the expression such an interpretation, the word " brink " has no reference to the edge or border of the precipice itself, and adds little or nothing to the meaning of the word " bank."

Defendant, on the other hand, insists that the language used by the grantor in the Lux deed cannot be given any such restricted meaning; that the word " brink " conveys the idea of elevation; that the expression " brink of the bank " means the brow or summit of the incline which rises abruptly from the water, the lower part of which holds the stream in bounds, no matter how high the top of that acclivity may be above high-water level. To put it another way, defendant claims that the brink of the bank is the point where the upland alongside the stream breaks and begins the sharp decline which ends at the water's edge.

Appellants have adopted as the brink of the bank of the river, and as the outside boundary line of the lands conveyed to Lux, an arbitrary line fixed by Mr. Buckley, their engineer. He claims to have studied the shores of the river for the purpose of determining the point where the water would be confined to its channel at high water, and fixes that point at four to four and one-half feet vertically above the water of the river at its mean low stage. He extended such line up the river and through the gorge, even though the bank was perpendicular and rose many feet higher, and called it the brink of the bank. It is upon this theory that plaintiffs hope to recover possession of parcels Nos. 2, 7 and 8.

If there is any ambiguity in the language used in the Horton-Lux deed, we are aided in our interpretation thereof by certain well-established rules. A doubtful expression contained in a conveyance must always be construed most favorably to the grantee. (*Blackman* v. *Striker*, 142 N. Y. 555, 560; *Matter of Ladue*, 118 id. 213, 219; *Duryea* v. *Mayor*, 62 id. 592; *Gaylord* v. *Barnes*, 128 App. Div. 810, 812.)

This rule is especially applicable here, because Mr. Horton's

attorney, who drew the deed and the agreements which preceded it, chose the language used in the various instruments.

If the description is capable of more than one construction, it is the duty of the court, so far as possible, to put itself in the position of the parties at the time the conveyance was made, and, in the light of the surrounding circumstances, ascertain and put into effect the very thing which the parties purposed to do. (*Wilson* v. *Ford*, 209 N. Y. 186, 196; *Mott* v. *Eno*, 181 id. 346, 373; *Herman* v. *Roberts*, 119 id. 37, 42, 43; *Smith* v. *Kerr*, 108 id. 31, 37; *Mott* v. *Richtmyer*, 57 id. 49, 59; *Bridger* v. *Pierson*, 45 id. 601; *Atlantic Mills of Rhode Island* v. *N. Y. C. R. R. Co.*, 221 App. Div. 386, 389, 390; affd., 248 N. Y. 535; *Ray* v. *Jaeger*, 131 App. Div. 294, 296.)

It is necessary, therefore, to briefly review the events which led up to the execution and delivery of this deed.

Byron C. Horton, plaintiffs' father, resided in the vicinity of the Salmon river all his life, and was content to pursue his avocation of a lumber dealer, and to operate a saw mill, giving no thought to the utilization of the waterfall on the river for the development of electric power. In February, 1901, he purchased 279 acres of land along the stream, known as the Falls lot, for the timber growing thereon, and with no idea of utilizing the falls for the development of power. In 1901, Mr. Charles A. Lux, a promoter, who had a vision of what might be accomplished in the development of power by the utilization of the various streams of the country, called upon Mr. Horton, and disclosed to him in confidence a plan which he had to acquire sufficient lands and property rights along the Salmon river, both above and below the falls, to develop an extensive hydro-electric power plant. The two conferred concerning the salient features of the project and the best method of accomplishing the desired result. These negotiations resulted in an option, dated November 11, 1901, in which Horton agreed to deed to Lux the Falls lot and other lands up the river, and the land between the brink of the two banks of the stream from the Falls lot down to the mouth of Blakeman brook or Beaver Dam brook, whichever Lux should designate, for the sum of $70,000. The option expired February 8, 1902. On December 28, 1901, Lux gave notice that he designated Blakeman creek as the site of the proposed power house, and the westerly terminal of the lands to be acquired, instead of the Beaver Dam brook, one and a quarter miles farther down the stream. Mr. Lux permitted his option to expire.

On October 16, 1902, the parties made a new agreement, which, in effect, was a contract of sale of substantially the same property described in the 1901 option. Lux paid the first installment of $5,000 due on this contract, and then defaulted. Horton over-

looked the default, and on December 22, 1905, the two entered into another agreement for the sale of this property for $72,000. Horton was to furnish abstracts showing a clear title. He agreed that he would neither directly nor indirectly purchase, lease or in any manner seek to control any land or water rights located along or above the falls on the river, or any tributary thereto, which might interfere with the flowage or reservoir rights of Lux or his assigns. Lux on his part agreed to employ L. L. Nunn, of Cleveland, Ohio, an expert hydraulic engineer, or some other engineer of equal rank, to make a complete investigation of the amount of water power of the river, and the reservoirs at or above said property, and as fast as such investigations were made to deliver copies of the reports and working drawings and plans to Horton.

On the date of this last contract, Horton executed a warranty deed conveying to Lux the property described in the agreement, and delivered the same in escrow to the State Bank of Syracuse. On March 14, 1912, Lux paid the balance due on the purchase price, and took up the deed. This is the instrument under which defendant claims title to the disputed lands.

When Horton gave the option of 1901, he owned no land down the stream from the Falls lot. In order to fulfill his agreement it was necessary for him to purchase the lands he had contracted to sell. This he subsequently did. He swore in his answer in *Lux* v. *Horton*, to which case reference will later be made, that his only purpose in acquiring this property was to put himself in shape to carry out his option. Notwithstanding this fact, he now seeks to hold out a goodly portion thereof, and limit his conveyance to Lux to the bed of the river and that portion of the bank which is bounded by a line extended vertically four or four and one-half feet above the low-water level.

Horton purchased some of these properties under descriptions strikingly similar to the expression used by him in the Lux deed. For instance, the southern boundary of the lands which Horton purchased from Judson and Martha West, of which parcel No. 2 is a part, is described as " a line on the brink of the bank of the top of the south bank of the south channel of Salmon River." At the time of this purchase, Horton recognized that there was a " brink " at the top of the south bank of the river. Parcel No. 7 is a part of the lands purchased by Horton from Emeline Dingman. A portion of this parcel lies between the several channels of the river at this point. At times the islands formed by these channels are largely under water. To be in a position to fulfill his option, Horton bought " all that lies south of the brink of the north bank of the north channel of Salmon River, where the stream

now flows." Appellants now want to limit the lands conveyed by their ancestor to that portion of the Dingman property which lies south of the north bank of the south channel, although the deed here under consideration refers to the bank of the river, and not of the south channel. Both channels constitute the river. To my mind, it is clear that all the land between the brink of the northerly bank of the northerly channel and the top of the southerly bank of the south channel is included in the grant to Lux. No mention was made of any of these islands. The fact that the deed excepts the island at Bennett bridge would indicate that the parties had in mind the various islands in the river when the Lux deed was executed, and that, if they intended to exempt the islands forming a part of parcel No. 7, they would have said so. In the description of other lands which Horton purchased to enable him to carry out his contract, we find the expression "brink of the bank." That is not so in all instances, however.

The abstracts which Horton furnished, pursuant to his agreement, covered all the property which he purchased to fulfill his option, and were not confined to the land which appellants now claim was covered by their ancestor's deed. These searches were examined by the attorneys for Lux, not only to determine whether the title was good, but also for the purpose of ascertaining whether the property described included all the lands between the brink of the banks of the river.

Plaintiffs justify their right to retain title to parcels 2, 7 and 8 by the fact that the defendant did not build its power house at the mouth of Blakeman brook, the location suggested in the Nunn plan, and which Lux had in mind when he made his agreement of October 16, 1902. Appellants have arbitrarily determined that all of the lands which their father bought are not needed for the development on the river because of this change, and for that reason they claim the right to retain parcels 2, 7 and 8. True, the Blakeman brook site was contemplated as the place where the power house would be erected, but there was no agreement that Nunn's recommendations would be followed, or that the building would be erected on any particular spot. Defendant had the right to locate it wherever it thought best. I fail to see how this change of plan affects the situation.

The object and purpose of Byron C. Horton in acquiring these lands is conceded, and has been adjudicated in *Lux* v. *Horton*. The intention and design of Lux and his assigns in purchasing the property was to construct a hydro-electric plant, in which all the water of the river would be used. This purpose was well known to Horton from the outset. In his acquisition of the land necessary

to fulfill his option to Lux, Horton evidenced an understanding of the phrase " brink of the bank " as meaning the top of the high bank. A fiduciary relation existed between Lux and Horton, and the latter was under obligation to assist in every way possible the consummation of the project. There certainly is no equity in permitting Horton's heirs to claim that the conveyance to Lux is to be given a different and more restricted meaning from that given to practically the same language in the deeds to their father. Fair dealing, it seems to me, demands that Horton's intent, when he bought this property, be carried out, and that the plaintiffs should not be permitted to retain this land, which has but little intrinsic value, but which, so far as parcel No. 2 is concerned, would leave the plaintiffs in control of a strip of land across defendant's penstocks, and in a position to destroy the backbone of the power plant, and the development on the river, which was the sole and known object and purpose of Lux in purchasing this property. Horton was getting $72,000 for property which cost him, as the record shows, less than $5,000.

This manifest intent of the parties as to the boundaries of the conveyance does no violence to the language used in the deed, and must govern in the interpretation to be given to the grant.

The exact location of the brink of the bank is a question of fact. By consent of the parties, and in company with their counsel, the referee inspected the property, and saw the river, the banks and the land above. In deciding this question of fact, the referee had before him not only the testimony of the witnesses, but the physical surroundings which he saw on his inspection. He undoubtedly gained knowledge by such personal investigation which was of great value to him in reaching a correct conclusion, possibly of more value than the testimony of some of the experts. No one can read this record without realizing the difficulty of locating the exact line which constitutes the brink of these banks. Under these circumstances, we think that the finding of the referee should not be disturbed, especially as it is not apparent that he proceeded on any wrong theory, or that he overlooked any material feature of the case. (*Weiant* v. *Rockland Lake Trap Rock Co.*, 61 App. Div. 383, 389; affd., 174 N. Y. 509.)

Turning now to the claims of the parties to parcel No. 1 — the island at Bennett bridge — attention should be called to the fact that this property was involved in the case of *Lux* v. *Horton*, and that the judgment in that action is *res adjudicata* here, and decisive of the question of who owns the island. It is expedient, therefore, to determine just what was decided in that litigation.

On March 14, 1912, the very day that Lux took up the deed in

question, he commenced an action in equity against Byron C. Horton, claiming that Horton had purchased the island at Bennett bridge and certain lands below the mouth of Blakeman brook, for the purpose of enabling him to fulfill his option of November 11, 1901, and that he insisted on retaining said property, although it was necessary to the proposed development on the river. It was sought in that action to impress a trust upon all lands so withheld, because of the fiduciary relation which existed between the parties, and to compel Horton, upon payment of the purchase price thereof, to convey said property to Lux. Lux succeeded upon the trial, but this court modified the judgment on appeal. (*Lux* v. *Horton*, 166 App. Div. 954; affd., 223 N. Y. 585.)

This court was of the opinion that the deed between the parties, which is the same instrument before us in this action, conveyed all the lands and riparian rights along the river which were called for in the contract, and that the evidence did not justify a conclusion that Horton was required to convey to Lux the fee to the island, or the bed of the river below the mouth of Blakeman brook. All the land in dispute in the present action is upstream from Blakeman brook. This court held that the agreement between the parties required Horton to convey to Lux all the lands and riparian rights described in the contract for the purpose of the hydro-electric development on the river, which purpose required the impounding and storage of the waters of the river by means of a dam and reservoir, and that the known and intended effect of the operation of such development would be the diversion of the water of the river, and its discharge into the stream at the foot of the tail race in varying quantities, and at irregular periods, and that the operation of the power plant would seriously interrupt and interfere with the natural flow of the river on both sides of the island, and that Horton, as the owner of the island and the bed and banks of the river below Blakeman creek, and of any other lands affected by such use, was estopped from questioning or interfering with such use of the waters of the river by Lux or his assigns.

The title to the island being in the plaintiffs, and the land being bounded by a non-navigable stream, plaintiffs' ownership carries with it the bed of the river to the center of each channel, unless a contrary intent is manifest by the dealing between the parties. (*White* v. *Knickerbocker Ice Co.*, 254 N. Y. 152; *Cramer* v. *Perine*, 251 id. 177, 183.) No such adverse purpose is apparent, and the referee has found that plaintiffs' title extends to the center of each channel.

Defendant concedes that certain of its transmission wires, and a part of the tail race, have been constructed on the island.

Whether any part of the power house encroaches thereon, as is so strenuously asserted by the plaintiffs, depends entirely upon the location of the center of the south channel of the river.

At the bottom of the high bank opposite the island is a level surface called the "flat," upon which the power house has been constructed, the southerly side extending back into the bank of the mainland some ten or twelve feet.

In order to determine just where the center of the channel is, it is necessary to determine what constitutes such center line — the *filium aquæ*, as it is so often called in the older decisions. Plaintiffs contend that this line is midway between the banks of the river at the ordinary height of the water, without regard to the contour of the channel. Defendant insists that the thread of the stream is the line to which the water would finally recede, just before it entirely ran out or evaporated. That line would depend upon the location of the low and deep parts of the channel, which many times would be upon one border or the other of the stream, and seldom, if ever, in its exact geographical center.

Water always seeks its lowest level. If the deepest part of a channel is well to one side, and the equi-distant rule is applied, the riparian owner upon the shallow side would, in times of drouth, be shut off from access to the water which is supposed to flow past his door, without trespassing upon the lands of his neighbor, as the exact middle of the stream would be on dry land. In the very nature of things, the thread or center of a stream must be the line which would give to the owner upon either side access to the water, whatever its stage might be, and particularly at its lowest flow. Upon principle, therefore, it would appear that the thread of a non-navigable river is the line of the water at its lowest stage. The weight of authority, in this State at least, upholds such contention. (*Halsey* v. *McCormick*, 13 N. Y. 296; *Child* v. *Starr*, 4 Hill, 369, 380; *Ex parte Jennings*, 6 Cow. 518; *People* v. *Canal Appraisers*, 13 Wend. 355; *Micelli* v. *Andrus*, 61 Ore. 78, 89.)

Years ago all the water of the river ran down the south channel. Where the present north branch is now located there was a narrow sluiceway, which ran from a dam farther up the stream. Finally the river broke through this cut, which gradually grew larger until it took practically all the water which flowed down the river, except in times of freshet. There is a bar just east of the island which prevents the water, except such as seeps through, from running down the south channel until the main stream reaches a flow of 745 cubic feet per second. The average flow of the river is 600 cubic feet per second. There is no appreciable flow over this bar

for 274 days in the average year, so that during the larger portion of the year the water in the south channel is very low.

The referee has found that the thread of the stream runs to the north of the power house. This question of fact has been resolved in favor of the defendant. I find ample evidence to support such a finding.

This brings us to the claim of the appellants that the judgment is improper in form. It has been found that the defendant has encroached upon a small part of the island with its poles, towers, wires and tail race. The judgment has failed, however, to grant a mandatory injunction, directing the removal of such structures, or to restrain respondent from further trespass. Instead, the judgment has fixed the value of the lands thus occupied, and has ordered the plaintiffs, upon payment of such sum, with interest and costs, to execute and deliver to defendant a deed of the property thus occupied; if, however, defendant fails to make payment or tender of such sum, defendant is then required to remove its structures.

This is an equity action. Plaintiffs allege that they have no adequate remedy at law. They seek a mandatory injunction requiring defendant to remove all its structures which encroach on the island. By commencing this action for equitable relief, they have submitted themselves to the jurisdiction of a court of equity. When such jurisdiction is once obtained, it is retained for all purposes, and the court may do complete justice between the parties and bring such relief down to the end of the litigation. (*Madison Ave. Baptist Church* v. *Oliver St. Baptist Church*, 73 N. Y. 82, 95; *Henderson* v. *N. Y. C. R. R. Co.*, 78 id. 423, 438; *Lynch* v. *M. E. R. Co.*, 129 id. 274, 280.)

The land encroached upon is wild and barren. Its value has been fixed by the referee at $225. Appellants gave no evidence that it was worth more. The granting of an injunction would work great injury and inconvenience to both the defendant and the public. Respondent has expended upwards of $4,000,000 in the erection of its power house and the development of the river. It has power to take lands and waters by condemnation. (Charter of Niagara, Lockport & Ontario Power Co. [Laws of 1894, chap. 722], § 12.) The matter is of too little consequence to compel the defendant to resort to condemnation proceedings, with the incident expense and delay, when the interests of all parties can adequately be taken care of in this action, and the whole controversy thus settled in an expeditious and inexpensive manner. (*Shaw* v. *Rochester, Syracuse & Eastern R. R. Co.*, 131 App. Div. 528.)

While the plaintiffs gave notice to the contractor that he was

encroaching upon their property, and demanded that he withdraw, I do not think that it can be said that the defendant was a willful trespasser. Defendant laid claim to the island, and the fact that the trial court in the *Lux-Horton* case upheld such claim gives some color and weight to it, and shows that it was more than a mere phantom. But whether the trespass was willful or not, it does not change the right of the defendant to condemn this property, nor does it affect the desirability of settling this entire controversy in one action.

If the protection of a legal right will do the plaintiffs but comparatively little good, and will greatly prejudice the defendant, or the public, equity will withhold its hand, and will remit the plaintiffs to their legal rights and remedies. A court of equity is not bound to intervene and grant a mandatory injunction simply to protect a trivial, technical or unsubstantial right. (*McCann* v. *Chasm Power Co.*, 211 N. Y. 301; *Pappenheim* v. *M. E. R. Co.*, 128 id. 436; *Lynch* v. *M. E. R. Co.*, 129 id. 274; *Peck* v. *Schenectady R. Co.*, 170 id. 298, 308; *Herrman* v. *Hartwood Holding Co., Inc.*, 193 App. Div. 115, 121, 122; *Lyon* v. *Water Commissioners of Binghamton*, 228 id. 585, 590; *Shaw* v. *Rochester, Syracuse & Eastern R. R. Co.*, 131 id. 528.)

Appellants urge that they have been deprived of their constitutional right to have their damages fixed by a jury. If the lands appropriated by defendant were condemned, the damages would not be determined by such tribunal. Plaintiffs having voluntarily subjected themselves to the jurisdiction of a court of equity, that court can retain jurisdiction, and arrogate to itself, as an incident to the main relief sought by the plaintiffs, the right to assess the damages which appellants have sustained by reason of defendant's trespass on their property.

I think that the court below had ample authority to grant the judgment in the form in which it was entered, and that its discretion should not be disturbed. If defendant does not pay the money damages fixed, an injunction issues. Appellants' rights are amply protected.

Space will not permit a discussion of the other objections raised by appellants. It is sufficient to say that we find none which, in our opinion, would warrant us in disturbing the judgment of the court below.

All concur. Present — CROUCH, TAYLOR, EDGCOMB, THOMPSON and CROSBY, JJ.

Judgment affirmed, with costs.