Anne S. Van Cortlandt and Others, Appellants, *v.* The New York Central Railroad Company, Respondent.*

Second Department, April 21, 1933.

* Revg. 139 Misc. 892.

*E. J. Dimock* [*M. Gregg Latimer, Cornelius O. Donahue* and *Eleanor S. Burch* with him on the brief], for the appellants.

*Jacob Aronson* [*Frederick L. Wheeler, William Mann, K. O. Mott-Smith* and *Leo Manville* with him on the brief], for the respondent.

DAVIS, J. The plaintiffs are the owners of lands on the Croton river near its outlet into Croton bay — a part of the Hudson river. Across the mouth of the river the defendant has a bridge. It is claimed by plaintiffs that the Croton river is navigable and that the bridge of the defendant interferes with its navigability. The defendant denies that the river is navigable or has been for many years. The theory of the action is that the bridge is a public nuisance interfering with the plaintiffs' rights, and this action is brought for the purpose of abating the nuisance by requiring a drawbridge to be installed; or, in lieu of that relief, for damages. On the trial the complaint was dismissed on the ground that the river was not navigable, and on other grounds.

When the defendant's predecessor, The Hudson River Railroad Company, was organized by a special act of the Legislature (Laws of 1846, chap. 216) permitting the construction of a railroad from New York to Albany along the Hudson river, section 15 of that chapter provided in part: " The said corporation is hereby authorized to build or erect a bridge over the Spuytenduyvel creek and other navigable streams or inlets, for the passage of the said road or ways, from or to the city of New York. Such bridges shall be substantially constructed, and shall contain a draw of sufficient width to admit the passage of vessels adapted to the navigation of said river, streams or inlet, with standing masts, and shall be so attended as not to obstruct, delay or hinder, the progress of any vessel navigating said river." There is proof (and it is not disputed) that in earlier times the Croton river was a navigable stream to a limited extent in its course and in the type of boats that could navigate it for commercial purposes. In 1841 there was a flood caused by the bursting of a dam, which somewhat

interfered with navigation by casting earth and rocks into the bed of the stream. Thereafter the question of its navigability becomes the subject of dispute. Nevertheless, there is proof that between the years 1841 and 1888 there was commercial navigation by poling boats by hand up the river at rising tide to docks and mills located on the shore. There was a dock where shipments of grain and coal were received; and raw material was brought in and finished products carried out from a dock at a wire mill there located. There is some evidence that vessels with masts came in and departed at somewhat infrequent intervals. Sufficient proof there is to establish the character of the river as a navigable stream during the period mentioned.

The wire mill was not a financial success and was abandoned about 1868. The use of another dock for shipping of some sort continued until about 1886. A pumping station for the Ossining water works was located on the river, and as late as 1889 a schooner brought material to build this pumping station; and it was intended to bring in coal by water, but difficulty was experienced in getting the railroad company to open its drawbridge, so that method of delivery had to be abandoned.

That the railroad corporation recognized that this river was one of the " other navigable streams " mentioned in the statute is indicated by the fact that in building the railroad a drawbridge was installed. This bridge remained until 1891, at which time navigation of the river seems to have been abandoned through nonuser, at least temporarily. In accordance with the prevailing fashion at the time, the railroad corporation proceeded to determine its rights for itself rather than seek remedial legislation, a determination by the court, or the extinguishment of existing rights by purchase. For, in the lack of present use for navigation on the river, the railroad in 1891 fastened down its drawbridge, making it immovable, so that boats, if any there were, could not pass. In 1898 the drawbridge was replaced with a new rigid bridge constructed close to the surface of the river, so that only the smallest boats, incapable of carrying cargoes, could then pass under it. There is no legal justification for the railroad corporation in thus constructing its bridge and closing the river to possible navigation.

For forty years and more there has been no navigation on the river. It is claimed by the plaintiffs that to a large extent this was due to the acts of the defendant just stated. On the part of the defendant it is said that the river is not and has not been during that time navigable in fact; and that there is no occasion or use whatever for navigation.

It is established that the bed of the river, together with the

mouth where it opens into the bay, has become obstructed by silt and debris accumulating during this period in which the river has not been in use for navigation; that the lands along the shore and those under water in front of the premises of plaintiffs and the sites of the old docks have grown up to brush and sedge; and that there would be no practicable way of reaching the channel. It has been found that " between deep water of the Hudson and the Albany Post Road bridge, such channel as exists, is at best 80 feet wide with a minimum depth of 5 feet at mean high tide and 1.6 feet at mean low tide." There is practically no dispute as to this finding.

There has been no legal declaration that the river is not navigable. Having once been capable of navigation, it did not become non-navigable by the fact of nonuser or because its channel became obstructed. So, as the capability of use remains, the river is in law navigable. It is the susceptibility of use, not the extent of existing commerce, that furnishes the test of navigability. (*Economy Light Co.* v. *United States*, 256 U. S. 113; *United States* v. *Utah*, 283 id. 64.) The stream is still navigable for small craft with the use of present types of motive power, or would be if it were not for the obstruction created by the defendant. So we may say that the river is navigable both in law and in fact in the limited manner indicated.

The principal property of the plaintiffs consists of an old manor house with some old farm buildings and an apple orchard. Otherwise the lands are unimproved and limited in extent for any agricultural purposes. There are 35.7 acres of upland and 51.8 acres of sedge. It is said that these lands are assessed for $13,000. With other lands, including lands under water, the total acreage of plaintiffs is 153.2 acres. These lands, as plaintiffs claim, have an unusual value because of their favorable location with ready access to the railroad, to the Post road, and to deep water, thereby furnishing exceptional advantages for shipping. Proof was offered by them that dredging at a cost of from $18,000 to $25,000 would deepen the channel to seven or eight feet at mean high tide; and that this depth could be maintained at an expense of $1,200 a year. Their ambitious plans did not stop with these slight improvements, for still there would be no access to the shores. Therefore, they have a plan of improvement contemplating bulkheading both sides of a 300-foot channel to the drawbridge, and both sides of a 100-foot channel running north 850 feet parallel to the Post road; dredging a channel 13 feet deep and 100 feet wide from deep water in the Hudson, widening to 300 feet in the area between the railroad and the Post road; then filling in behind all bulkheads to a level of

five feet above mean high water. The cost of this enterprise is estimated at about $700,000. Just how this large sum is to be raised under present financial conditions is not stated. This will leave eighty-five acres of improved land north of the channel and forty-seven acres south of it. This, according to experts, will make the value of the land from $2,405,000 to $3,140,000 for use as industrial sites. The cost to the railroad of putting in a draw-bridge is concededly $3,000,000.

All these values to be given the land depend entirely on testimony of experts based on the value of land at other points on the Hudson river where industrial enterprises have already been located. There is no proof whatever of any offer for any of plaintiffs' lands or of any prospect of a sale. The values exist only in the imagination based upon conditions prevailing several years ago. No account is taken of the present general business and economic depression or of the fact that many industrial plants are now idle and practically all others are operating on a greatly decreased scale; and that many could be bought at a small fraction of their original cost. The theories of value and of the damages caused by the obstruction of the river and fixed by plaintiffs at $450,000, are purely fanciful, speculative and conjectural. It may be added that the plaintiffs did not discover the possibilities of value in river navigation for many years; and that the interruption of defendant's train service would be serious if it were required to remove its present bridge.

A majority of the court recognize the fact that Croton river may in the future be made profitably navigable, and that defendant's structure is unlawful; and further, that the claim of plaintiffs of present damage is of a chimerical and visionary character. It is not possible to look into the future and say that the ambitious plans of the plaintiffs will not come to fruition. It may be that later developments in manufacturing or commerce will include these lands in the manner contemplated. At present it is at best a hope or a prophecy, not forming the basis of substantial value or of resulting damage. The granting of the mandatory injunction sought could be of no benefit to the plaintiffs and would cause great harm to defendant.

We think that the proper solution is to award judgment determining that the river is in fact navigable; that the plaintiffs have the legal right of navigation; that the railroad has made an unlawful and continuing trespass by making its bridge rigid without color of legal authority; and that the plaintiffs have the right to maintain this action to abate the public nuisance, having suffered damages at the present time of nominal character but potentially more substantial in the future. These rights they have not lost either

through prescription or laches; but the damages that they may sustain in the future are too speculative and problematical to make an attempt to measure them at the present time wise or in the practical sense possible. Therefore, the rights of the plaintiffs should be declared, but a mandatory injunction denied at the present time as a matter of discretion, and the question of damages left for future consideration.

In reaching this conclusion we follow well-established authority in dealing with similar situations. (*McCann* v. *Chasm Power Co.*, 211 N. Y. 301; *Thompson* v. *Fort Miller Pulp & Paper Co.*, 195 App. Div. 271; *Lyon* v. *Water Commissioners of Binghamton*, 228 id. 585.) Courts of equity are not bound to grant a mandatory injunction to protect a trivial, technical or unsubstantial right where the result would be to impose an unwarranted burden on the trespasser. (*Horton* v. *Niagara, Lockport & Ontario P. Co.*, 231 App. Div. 386.) We think that a sum should be awarded as present damages to cover the cost incurred by the plaintiffs in preparing their maps and other exhibits necessary to establish their rights (if susceptible of proof — otherwise nominal), but the granting of an injunction should be withheld; and that as the action was brought about by unjustifiable acts on the part of the defendant, it should be penalized with costs. (*Wisconsin* v. *Illinois*, 281 U. S. 179.)

The judgment should be reversed on the law and the facts, with costs, and judgment rendered in favor of the plaintiffs for damages to the extent indicated, with leave to the plaintiffs to apply at any time on the foot of the judgment, upon showing substantial injury from any cause to them hereafter occurring, for damages or for an injunction as the court may direct; or at their election the plaintiffs may bring a separate action for such other relief as they may be advised on account of any injury to their property and rights hereafter occurring.

KAPPER and CARSWELL, JJ., concur; TOMPKINS, J., with whom YOUNG, J., concurs, reads for reversal and the direction of a judgment for plaintiffs for the injunctive relief demanded in the complaint, unless defendant, within a time to be fixed by the court, shall pay to plaintiffs their damage in the sum of $450,000 in exchange for a proper deed or conveyance of an easement with respect to plaintiffs' said lands, and permitting the maintenance by defendant of such bridge, and for the costs of this action.

TOMPKINS, J. (concurring as to reversal, dissenting as to damages). All the members of this court agree that the proofs establish the fact that the Croton river is a navigable stream, from the Hudson

river, to, along and through the plaintiffs' premises. We also agree that the defendant's railroad bridge is an unlawful obstruction of the Croton river and that it was erected and is maintained in violation of section 15 of chapter 216 of the Laws of 1846, by which defendant's predecessor was incorporated, which provided as follows: " The said corporation is hereby authorized to build or erect a bridge over the Spuytenduyvel creek and other *navigable streams* or inlets, for the passage of the said road or ways, from or to the city of New York. Such bridges shall be substantially constructed, and shall contain a *draw* of sufficient width to admit the passage of vessels *adapted to the navigation of said river, streams or inlet*, with standing masts, and shall be so attended as not to obstruct, delay or hinder, the progress of any vessel navigating said river. They are also required to construct such bridges as may be necessary to provide for the free passage of such vessels and boats *as heretofore have or now can pass into and from the same, the bays that may be crossed by said railroad;* and if any wharf or dock shall be cut off by the said railroad, the said company shall extend or so improve the same as to restore it to its former usefulness, so far as it may be practicable to do so. And the owner or owners thereof are hereby authorized to occupy the river front, outside of said railroad, for the erection and use of wharves or docks."

We are also in accord on the proposition that defendant has not acquired a right to maintain its bridge by prescription, and that plaintiffs have not, by laches, lost their rights to the use of Croton river for navigation from their property to and from the Hudson river. The majority opinion concedes that the defendant's bridge, which obstructs navigation on the Croton river, is a public nuisance and that plaintiffs have sustained some damage and have a right to maintain this action to abate said public nuisance. The only difference in the views of the members of the court is as to the form of relief that shall be given the plaintiffs. In my opinion, plaintiffs are entitled to more than nominal damages, and, in view of the facts, as to which we all agree, that they are entitled to a mandatory injunction for the removal by defendant of its bridge and the abatement of the nuisance, unless defendant shall pay to the plaintiffs their damage, which is the difference between the value of their property with and without the bridge. Plaintiffs' witnesses testified that plaintiffs' damage is $450,000, and there is no testimony to the contrary, except upon the theory that Croton river is non-navigable and that the defendant's bridge is not an obstruction to navigation or a public nuisance and hence that plaintiffs have suffered no damage.

In view of our unanimous finding in plaintiffs' favor on these questions, it seems to me that the only logical conclusion is that plaintiffs have suffered damage in the sum of $450,000 as testified by their expert witnesses. The plaintiffs, by their amended complaint, ask for an alternative form of judgment as follows: " or if there exist in this case such special circumstances as would justify the extension of such a privilege to the defendant, that the court's direction for the removal of said present rigid and ·immovable bridge and its injunction against the maintenance of any bridge which will interfere with navigation as aforesaid be conditioned upon the defendant's failure, within a reasonable time (to be fixed by the court) to tender to the plaintiffs the sum of $450,000 and a form of conveyance (in tenor to be fixed by the court) of an easement, with respect to the plaintiffs' said lands, permitting the maintenance of such bridges, and to demand the due execution and delivery of such conveyance by the plaintiffs in exchange for the payment of said sum of $450,000."

Plaintiffs do not ask for the removal of the bridge plus damages, but only for the removal of the bridge, or, as an alternative, for their damage of $450,000 (which is less than one-sixth the cost of removing the bridge as testified by defendant's witnesses), upon the execution and delivery to the defendant of a conveyance and easement with respect to the plaintiffs' lands, permitting the maintenance of its present bridge.

The cases cited in the majority opinion as authority for deferring injunctive relief are *McCann* v. *Chasm Power Co.* (211 N. Y. 301); *Thompson* v. *Fort Miller Pulp & Paper Co.* (195 App. Div. 271); *Lyon* v. *Water Commissioners of Binghamton* (228 id. 585) and *Horton* v. *Niagara, Lockport & Ontario P. Co.* (231 id. 386), none of which, in my opinion, justifies the conclusion of the majority of this court.

In the *McCann Case* (*supra*) there had been a dam constructed by the defendant by reason of which plaintiffs' property at certain times was overflowed 420 feet beyond the defendant's upper line. No land or timber belonging to plaintiffs was overflowed. The water merely went up to the sides of a rock chasm on plaintiffs' property. Some of the plaintiffs were stockholders in the defendant's power company, and the court found that they were actuated by some ulterior motive to harm defendant without obtaining any particular benefit themselves. Some of the plaintiffs helped to build the dam, knowing that the water would flow back into the gorge beyond the defendant's land, and then subsequently purchased the land of the upper riparian owners with the manifest intention of making trouble for the defendant. The plaintiffs

had obviously suffered no damage by reason of the overflow in that part of the chasm belonging to them. Plaintiffs claimed on the trial that they wanted to build a power plant above the defendant, and that by reason of the overflow they could not do so. The appellate court (151 App. Div. 304) modified the judgment of the Trial Term, which granted plaintiffs an injunction, by suspending its present operation and providing that the plaintiffs might at any time apply at the foot of the judgment upon showing substantial injury from any cause to them thereafter occurring. On the trial it appeared that, while the plaintiffs could build a dam in the gorge on their property, there would be no mill site at that point — the bank on which it could be built being fifty feet above the water, and they could not carry the water downstream through a water trunk to any place where a mill might be located, without interfering with the defendant's dam; and that, if they desired to develop a water power, they must go further up the chasm where a site for a mill could be located, and that an injunction to the plaintiffs could do no good and would greatly harm the defendant.

That case differs from the case at bar in that the plaintiffs here have proved the immediate availability of their premises for industrial and manufacturing purposes if the work of dredging, bulkheading, etc., planned and testified to by plaintiffs' witnesses as feasible is performed, but plaintiffs' premises cannot be profitably developed or used for manufacturing or industrial purposes without access to the Hudson river by means of the Croton river.

In the *Thompson Case (supra)*, cited in the majority opinion, where the plaintiff sought an injunction restraining defendant from maintaining a dam and for injunctive relief, it appeared that the predecessors of defendant acquired land by a deed which recited " the right to build a dam across said river or any part of it opposite to said farm and to abut the same against the west bank of said river on said farm and to keep and maintain the same there forever." In the case at bar the defendant not only never acquired the right to build and maintain its present rigid bridge across the Croton river, but, on the contrary, section 15 of chapter 216 of the Laws of 1846, under which the defendant's predecessor was incorporated and which authorized the erection of bridges over navigable streams and inlets, provided that " such bridges shall be substantially constructed, and shall contain a draw of sufficient width to admit the passage of vessels adapted to the navigation of said river, streams or inlet, with standing masts, and shall be so attended as not to obstruct, delay or hinder, the progress of any vessel navigating said river." This provision of the defendant's charter was observed from 1847 or 1848 by the construction of a

railroad drawbridge across the Croton river, which was maintained and operated until 1891, when the draw was spiked down so that it became immovable, and in the year 1898 the old drawbridge with the spiked draw in it was torn down and the present rigid bridge was constructed, in direct violation of the provision and requirement of the defendant's charter, and that rigid bridge has been maintained down to the present time, so that the difference between the *Thompson Case* (*supra*) and the case at bar in this respect is clear. In the *Thompson Case* (*supra*) the court found that the maintenance of the defendant's dam was not a public nuisance, and therein is that case plainly distinguishable from the case at bar. On this appeal we are unanimous in finding that the defendant's bridge is a public nuisance, obstructing the use of the Croton river, which we find to be navigable. Besides, in the *Thompson Case* (*supra*), the court held that the damage to the plaintiff's farm was so small that it " almost defies computation."

In *Lyon* v. *Water Commissioners of Binghamton* (*supra*) the plaintiffs owned a mill and had riparian rights on the Susquehanna river, dating back to 1828. In 1887 the defendant began diverting water above plaintiffs' mills for the purpose of supplying the city of Binghamton. Such diversion continued and increased up to the time of the trial. The average flow of the river was 4,400 cubic feet per second. The plaintiffs' mill was not equipped to use over 278 cubic feet per second. The court said (at p. 590): " There is a great superabundance of flowage over the crest of the dam, unused and going to waste, notwithstanding the diversion of water by the city. The plaintiffs have sustained no damage in the past and no such damage is threatened. The trespass upon their legal rights by the city is not shown to have prevented or interfered with plaintiffs' present or contemplated use of their lands and water power rights."

In the case before us the plaintiffs have shown, by uncontradicted testimony, that the defendant is interfering with their " present or contemplated use of their lands."

In *Horton* v. *Niagara, Lockport & Ontario P. Co.* (231 App. Div. 386), referred to in the majority opinion by Mr. Justice DAVIS, the defendant had trespassed upon a small part of plaintiffs' land by the erection of poles, towers, wires, etc., which were connected with the defendant's power house, no part of which, however, encroached upon plaintiffs' land. The plaintiffs brought an action for equitable relief for the removal of defendant's said structures. The court held that the value of the land encroached upon was small and that the granting of an injunction compelling the defendant to remove its structures would work great injury and incon-

venience both to the defendant and to the public, and refused equitable relief, saying that a court of equity is not bound to grant a mandatory injunction "simply to protect a trivial, technical or unsubstantial right," and the relief given to the plaintiffs in that case was precisely in line with the request of the plaintiffs in their amended complaint, which I have above quoted. The court in that case gave judgment to the plaintiffs, fixing the value of the lands encroached upon by defendant, and ordered plaintiffs, upon payment of such sum, to execute and deliver to the defendant a deed of said lands, or, in the event of failure of payment, that the defendant be required to remove its structures. The plaintiffs in the case at bar are, in my opinion, entitled to similar relief, namely, an injunction requiring the removal of the present bridge and enjoining the defendant and its successors and assigns from constructing or maintaining any bridge in the future that shall interfere with the plaintiffs' rights in the Croton river, unless the defendant shall, within a reasonable time to be fixed by the court, pay to the plaintiffs their damage in the sum of $450,000 upon the execution and delivery by plaintiffs to the defendant of a proper deed or conveyance of an easement with respect to plaintiffs' lands, permitting the maintenance of such bridge.

The judgment should be reversed on the law and the facts, with costs, and judgment given plaintiffs for the injunctive relief demanded in the complaint, unless defendant, within a time to be fixed by the court, shall pay to plaintiffs their damage in the sum of $450,000 in exchange for a proper deed or conveyance of an easement with respect to plaintiffs' said lands, and permitting the maintenance by defendant of such bridge, and for the costs of this action.

YOUNG, J., concurs.

Judgment reversed on the law and the facts, with costs, and judgment rendered in favor of the plaintiffs for damages to the extent indicated in opinion by DAVIS, J., with leave to the plaintiffs to apply at any time on the foot of the judgment, upon showing substantial injury from any cause to them hereafter occurring, for damages or for an injunction as the court may direct; or at their election the plaintiffs may bring a separate action for such other relief as they may be advised on account of any injury to their property and rights hereafter occurring. All findings inconsistent herewith will be reversed and new findings will be made.

Settle order and findings on notice.